E-FILED; Anne Arundel Circuit Court
Docket: 6/2/2021 1:09 PM; Submission: 6/2/2021 1:09 PM

## IN THE CIRCUIT COURT
## FOR ANNE ARUNDEL COUNTY, MARYLAND

| | |
|---|---|
| MICHAEL STEPHEN CROPP<br>32541 585th Ave,<br>Cambridge IA 50046<br><br>      Plaintiff,<br><br>  v.<br><br>**EQUIFAX INFORMATION SERVICES, LLC,**<br>1550 Peachtree Street, NW<br>Atlanta GA 30309<br>Serve On:<br>    Csc-Lawyers Incorporating Service<br>    Compan<br>    7 St. Paul Street, Suite 820<br>    Baltimore MD 21202<br><br>**EXPERIAN INFORMATION SOLUTIONS, INC.,**<br>505 City Pkwy West<br>Orange CA 92668<br>Serve On:<br>    The Corporation Trust, Incorporated<br>    2405 York Road, Suite 201<br>    Lutherville Timonium MA 21093-2264<br><br>**BANK OF AMERICA, N.A.,**<br>100 NORTH TRYON STREET<br>CHARLOTTE NC 28255<br>Serve On:<br>    The Corporation Trust, Incorporated<br>    2405 York Road, Suite 201<br>    Lutherville Timonium MA 21093-2264<br><br>**COMENITY BANK,**<br>One Righter Parkway, Suite 100<br>Wilmington, DE 19803<br>          Defendants. | Case No.: C-02-CV-21-000741<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Michael Stephen Cropp files this complaint through undersigned counsel, for Defendants wrongful refusal to correct inaccurate credit reporting.

1.     Plaintiff is a victim of identity theft.

2.     The identity thief opened accounts in the name of Michael Cropp with Defendants Bank of America, N.A. ("BANA") and Comenity Bank, N.A. ("CBNA")(collectively "Bank Defendants"). On information and belief, each account was opened using a Maryland address, by an individual in Maryland and statements were sent to the Maryland address.

3.     The identity thief did not pay the accounts, and the accounts went into default.

4.     The Banks reported the fraudulent accounts in the name of Michael Cropp as delinquent to three national Consumer Reporting Agencies, Defendant Experian Information Solutions, Inc. ("Experian"), Defendant Equifax Information Services, LLC ("Equifax")(collectively, the CRA Defendants") and non-party Trans Union LLC ("Trans Union")(collectively "The CRAs").

5.     When Mr. Cropp discovered the accounts, he disputed the negative information with the CRAs, on the grounds that he did not open, authorize or benefit from the accounts and they were the result of fraud.

6.     After investigating Mr. Cropp's dispute, Trans Union deleted all the fraudulent accounts. The Bank Defendants sought to maintain the fraudulent accounts on Mr. Cropp's credit reports. Experian and Equifax, instead of properly investigating the dispute chose to parrot the Bank Defendants' claims that the accounts were legitimate.

## PARTIES

7.  Plaintiff is a resident of Cambridge, Iowa.

8.  Defendant Equifax is a Georgia LLC. Its principal office is in Atlanta, Georgia. Defendant Equifax does business throughout the United States.

9.  Defendant Experian is a California corporation. Its principal office is in Orange, California.

10. Defendant BANA is a National Association. Its principal office is in Charlotte, North Carolina.

11. Defendant Comenity Bank is a National Association. Its principal office is in Wilmington, Delaware.

## JURISDICTION

12. This court has subject matter jurisdiction under 15 U.S.C. § 1681p.

13. This court has personal jurisdiction over defendants because defendants all do business in Maryland, and the identity theft underlying all of Plaintiff's claims took place in Maryland and arose from Defendants' business in Maryland.

14. Venue is proper in Anne Arundel County under Md. Code Ann., Cts. & Jud. Proc. §§ 6-201 & 6-202 because no single venue is applicable to all defendants, and all defendants are out of state entities.

## THE FAIR CREDIT REPORTING ACT ("FCRA")

15. Congress enacted the FCRA to require the consumer reporting agencies to adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. 15 U.S.C. § 1681b.

16.    Under the FCRA, whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b) (emphasis added).

17.    Under the FCRA, if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer, and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate—free of charge—and report the current status of the disputed information, or delete the item from before the end of the 30-day period beginning on the date on which the agency receives the notice of dispute from the consumer. 15 U.S.C. § 1681i(a).

18.    Under the FCRA, when a consumer reporting agency conducts any reinvestigation with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer. 15 U.S.C. § 1681i(a)(4).

19.    Under the FCRA, if, after any reinvestigation of any information disputed by a consumer, an item of information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation. 15 U.S.C. § 1681i(a)(5).

20.    Under the FCRA, after a furnisher of information receives notification pursuant to §1681i(a)(2) of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the furnisher shall (A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by the consumer reporting agency pursuant to § 1681i(a)(2) of this

title; (C) report the results of the investigation to the consumer reporting agency; and (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis. 15 U.S.C. § 1681s-2(b).

21.     Under the FCRA, any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer, is liable to that consumer: in an amount equal to the sum of any actual damages sustained by the consumer as a result of the failure; statutory damages of not less than $100 and not more than $1,000; such amount of punitive damages as the court may allow; and the costs of the action together with reasonable attorneys' fees. 15 U.S.C. § 1681n.

22.     Under the FCRA, any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer, is liable to that consumer in an amount equal to the sum of any actual damages sustained by the consumer as a result of the failure and the costs of the action together with reasonable attorney's fees.15 U.S.C. § 1681o.

23.     CRAs compile information about an individual consumer into a "file". CRAs then sell information contained in the consumers' file to persons with a permissible purpose to obtain a consumer report on the consumer, such as potential employers, creditors and landlords.

24.     One source of information for CRAs is entities that do business with the consumer. When an entity provides information about a consumer, the entity is called a "furnisher." When a furnisher provides information about a consumer's account, the information about that account in a consumer's file is called a "tradeline".

25. A tradeline which damages a consumer's reputation for creditworthiness is said to be "negative" or "derogatory."

26. When a consumer disputes the accuracy of a tradeline with a CRA, the CRA transmits the dispute to the furnisher of the tradeline through a system called e-OSCAR.

27. e-OSCAR uses an Automated Consumer Dispute Verification form ("ACDV") to summarize a dispute and the furnisher's response to it. The basis for the consumer's dispute is not fully described in the ACDV, which only contains a numeric dispute code with general instructions. e-OSCAR transmits the ACDV form for the dispute to the furnisher, together with any documents sent with the dispute, and transmits the ACDV containing the furnisher's response to the CRA.

## FACTS

28. Mr. Cropp lived in Maryland until 2013.

29. From 2013 to 2016, Mr. Cropp lived in Kansas, attending college.

30. From 2017 onward, Mr. Cropp lived in Iowa.

31. In March 2020, Mr. Cropp discovered a number of fraudulent accounts had been opened in his name, using an address in Maryland.

32. Amongst those accounts were:

   a. An account with BANA ending 4577 ("BANA Account"), opened on or about May 5, 2015.

   b. An account with CBNA ending 4317, on information and belief branded to Pottery Barn ("Pottery Account"), opened on or about November 29, 2015.

   c. An account with CBNA ending 6765, on information and belief branded to Restoration Hardware ("Hardware Account"), opened on or about

December 1, 2015.

33. The Bank Defendants each furnished information to the CRAs about the fraudulent accounts.

34. On July 24, 2020, Plaintiff sent to each CRA a written dispute about ten fraudulent accounts, including the BANA, Pottery and Hardware Accounts, and incorrect address and telephone numbers found in his credit files.

35. The CRAs each received the dispute.

36. On information and belief, the CRAs each transmitted the dispute to each of the Bank Defendants.

37. On information and belief, each Bank Defendant responded to the dispute by verifying as accurate the information that they had furnished – in effect telling the CRAs that their accounts were not fraudulent and that Mr. Cropp was responsible for them.

38. Plaintiff also directly disputed the BANA account with Bank of America, and the CBNA accounts with Midland Funding, LLC, a non-party which claimed to have bought the accounts from CBNA.

39. Trans Union deleted all the fraudulent accounts; Experian deleted all the fraudulent accounts except the BANA account and Equifax deleted some of the fraudulent accounts, but failed to delete the BANA account or the CBNA accounts.

40. Plaintiff sent follow up letter to Experian and Equifax, but neither changed deleted the fraudulent accounts that they had retained after the first dispute.

41. After all of Mr. Cropp's efforts, the following false information was reported by the following CRAs:

| Account (Creditor) | Negative Information | Trans Union Report | Experian Report | Equifax Report |
|---|---|---|---|---|
| BANA (BANA) | Charged off, $6,275 written off, $2675 past due, closed at credit grantor's request, account late since February 2017 | Deleted | Currently being reported | Currently being reported |
| Pottery (CBNA) | Charged off, account late since February 2017 | Deleted | Deleted | Currently being reported |
| Hardware (CBNA) | Charged off, account late since December 2016 | Deleted | Deleted | Currently being reported |

### Direct Disputes on the BANA Account

42.     Mr. Cropp complained directly to BANA that the BANA account was fraudulent. In a telephone conversation, BANA told Mr. Cropp that it was unable to determine who had made payments on the account.

43.     On June 30, 2020, BANA wrote to Mr. Cropp stating that "[a]fter a thorough review, it's been determined that statements were mailed to you and payments were made. As a result you'll be responsible for any balance on the account."

44.     On July 15, 2020, Mr. Cropp replied to BANA, through counsel, pointing out that any statements sent, were sent to an address where Mr. Cropp did not live, and the mere fact that someone had made payments did not make Mr. Cropp liable on the account.

## Direct Disputes on the CBNA Accounts

45.     On information and belief, the Pottery Account and the Hardware Account were sold by CBNA to non-party Midland Funding, LLC ("Midland").

46.     Midland sued Mr. Cropp in Maryland on the Pottery Account in Case Number 0602-0002471-2018. Although Mr. Cropp was never served, a judgment was entered against him on the account.

47.     Midland sued Mr. Cropp in Maryland on the Hardware Account in Case Number 0602-0021403-2017. Although Mr. Cropp was never served, a judgment was entered against him on the account.

48.     Mr. Cropp, through counsel, complained to Midland that he was a victim of identity theft and had never been served. Midland agreed to vacate the judgments and dismiss both cases.

49.     The judgment in the Pottery Account case was vacated and the case dismissed on July 21, 2020.

50.     The judgment in the Hardware Account case was vacated and the case dismissed with prejudice on December 10, 2020.

### Trans Union's Response

51.     On August 15, 2020, Trans Union responded to Mr. Cropp's dispute, stating that it had deleted all of the fraudulent accounts.

### Experian's Response

52.     On August 18, 2020, Experian responded to Mr. Cropp's dispute, stating that it had deleted some of the fraudulent accounts but not others. In particular, Experian deleted the Pottery Account and the Hardware Account, but not the BANA Account.

53.    On October 8, 2020, Mr. Cropp sent a dispute letter to Experian providing additional information, including the outcomes of his previous dispute with Trans Union.

54.    Experian never responded to Mr. Cropp's October 8, 2020 dispute.

55.    On February 22, 2021, Mr. Cropp again sent a dispute letter Experian disputing the fraudulent accounts.

56.    Experian received the letter.

57.    On March 29, 2021, Experian responded to the February 22, 2021 dispute stating that the BANA account remained on Mr. Cropp's file.

58.    On information and belief, Experian failed to conduct a reasonable investigation of Mr. Cropp's disputes. This is based on the fact that Trans Union deleted all of the fraudulent accounts and Experian deleted some of the disputed accounts, thus conceding that Mr. Cropp is a victim of identity theft, but nevertheless maintained the BANA Account in Mr. Cropp's credit file.

## Equifax's Response

59.    Equifax failed to respond to Mr. Cropp's dispute. Instead, on August 7, 2020, Equifax wrote to Mr. Cropp's attorneys (incorrectly addressing the letter to "Amli Compny" stating that it was "unable to locate a credit file."

60.    On September 3, 2020, through his attorneys Mr. Cropp wrote back to Equifax enclosing a copy of his original dispute and asking Equifax what its "Amli Compny" meant.

61.    Equifax did not respond.

62.    On October 8, 2020, Mr. Cropp sent a dispute letter to Equifax providing

additional information, including the outcomes of his previous disputes with Trans Union and Equifax.

63.     On October 23, 2020, Equifax responded that it was unable to locate Mr. Cropp's credit file.

64.     On November 24, 2020, Mr. Cropp responded to Equifax enclosing copies of his driver's license and social security card and asking for a response to his previous dispute.

65.     Equifax never responded to Mr. Cropp's October 8, 2020 dispute.

66.     On February 22, 2021, Mr. Cropp again sent a dispute letter Equifax disputing the fraudulent accounts.

67.     Experian and Equifax received the dispute letters.

68.     On March 7, 2021, Equifax sent Plaintiff a copy of his credit file, but failed to respond to the February 22, 2021 dispute.

69.     On information and belief, Equifax failed to conduct a reasonable investigation of Mr. Cropp's disputes. This is based on its failure to provide response to his disputes and that Equifax kept all the disputed accounts in Mr. Cropp's credit file.

70.     On information and belief, each time a CRA received a dispute from Mr. Cropp, it forwarded that dispute to BANA.

71.     On information and belief, BANA responded to each dispute it received that the BANA Account information it furnished was accurate.

72.     On information and belief, BANA failed to conduct a reasonable investigation because it wrongly verified the information as accurate when it was not. This is based on BANA's statement that it considered the account valid because

payments had been made and statements sent, even though BANA did not know who the payor on the account was, and even though Mr. Cropp presented evidence that he did not live at the billing address to which statements were sent.

**CBNA's Response**

73. On information and belief, CBNA responded to each dispute it received that the information it furnished about the Pottery and Hardware accounts was accurate.

74. On information and belief, CBNA failed to conduct a reasonable investigation because it wrongly verified the information as accurate when it was not. This is based on the fact that CBNA sold both accounts to Midland, and Midland deleted both accounts following Mr. Cropp's complaint.

75. Mr. Cropp has been damaged by Defendants actions in that:

a. He has expended time and money trying to have the fraudulent accounts removed from his credit reports.

b. He has withdrawn himself from the credit market, fearing that he will be treated adversely due to the false information in his reports.

c. He experienced emotional distress with accompanying physical manifestations, in particular:

   i. Distraction from everyday matters and fixation on negative credit reporting;

   ii. Sleeplessness;

   iii. Embarrassment;

   iv. Avoidance of normal discussions of financial matters among friends;

      v.  Stress;

     vi.  Anxiety;

    vii.  Anger;

   viii.  Frustration

## COUNT I – Fair Credit Reporting Act 15 U.S.C. §§ 1681e(b) & 1681i(a) – Experian & Equifax

76.    Plaintiff repeats the foregoing allegations as though fully set forth here.

77.    Plaintiff is a consumer within the meaning of 15 U.S.C. § 1681a(c) because he is an individual.

78.    The CRA Defendants are Consumer Reporting Agencies within the meaning of 15 U.S.C. § 1681a(f) because they are persons who "for monetary fee . . . regularly engages . . . in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties and . . . use⬜ . . . means . . . of interstate commerce for the purpose."

79.    The CRA Defendants were required to "follow reasonable procedures to assure maximum possible accuracy of the information" when preparing a consumer report. 15 U.S.C. § 1681e(b).

80.    The CRA Defendants each prepared consumer reports concerning Plaintiff after he had disputed the fraudulent accounts.

81.    The CRA Defendants included in their reports false information despite Plaintiff's disputes.

82.    On information and belief, the CRA Defendants failed to follow reasonable procedures to assure maximum possible accuracy in their reports concerning Plaintiff.

83.     On information and belief, it is the CRA Defendants' policy to parrot the responses transmitted to them by furnishers through the e-OSCAR system.

84.     The e-OSCAR system provides for no narrative response by furnishers, and the CRA Defendants receive no evidence, documentation or explanation for the responses given to a dispute by furnishers.

85.     On information and belief, it is the CRA Defendants' policy not to require evidence, documentation or explanation from a furnisher, even when a disputing consumer has attached documentary evidence.

86.     On information and belief, the CRA Defendants' policies fail to take into account the outcome of disputes to other CRAs, and the outcomes of related disputes as to different accounts. Each disputed account is treated separately even where the underlying reason for the dispute – such as identity theft – is the same.

87.     On information and belief, the CRA Defendants' policies allow inconsistent and irrational treatment of disputed accounts, so that some fraudulent accounts are deleted while other fraudulent accounts are verified, where no reasonable basis exists for treating the accounts differently.

88.     In addition, Defendant Equifax allowed CBNA's tradelines for the Pottery and Hardware accounts to remain on Plaintiff's credit file and to appear in his credit reports, even though Midland's tradelines for the same accounts had been deleted.

89.     The CRA Defendants acted willfully in failing to follow reasonable procedures.

90.     The CRA Defendants had an obligation to "conduct a reasonable reinvestigation to determine whether the disputed information [was] accurate" within 30 days from receipt of the dispute. 15 U.S.C. § 1681i(a)(1)(A).

91.    The CRA Defendants failed to conduct such an investigation, instead parroting the responses of the Bank Defendants.

92.    The CRA Defendants had an obligation to delete or modify any information "found to be inaccurate or incomplete or [which] cannot be verified."

93.    The CRA Defendants did not delete the fraudulent accounts, and the truth of the information in them could not be verified (because they were fraudulent).

94.    The CRA Defendants acted willfully in failing to conduct a reasonable reinvestigation and failing to delete unverifiable information.

95.    Plaintiff was damaged as aforesaid.

**Wherefore,** Plaintiff seeks the following relief:

A.  An amount to be determined by the jury for compensatory damages in an amount in excess of $75,000;

B.  An amount of punitive damages to be determined by the jury in excess of $75,000;

C.  An award of costs and reasonable attorneys' fees to Plaintiff;

D.  Such other and further relief the nature of the Plaintiff's cause may require.

### COUNT II – Fair Credit Reporting Act 15 U.S.C. §1681s-2(b) – BANA & CBNA

96.    Plaintiff repeats the foregoing allegations as though fully set forth here.

97.    The Bank Defendants are each furnishers of information to the CRA Defendants.

98.    The Bank Defendants had an obligation under § 1681s-2(b) to conduct an investigation of any dispute transmitted to them by a CRA.

99.    The Bank Defendants violated § 1681s-2(b) by conducting only a

superficial, unreasonable investigation.

100.    BANA acted willfully in failing to investigate because it already knew that it could not verify that Plaintiff was liable on the account: it knew that he had not lived at the address to which he sent statements and it knew that it could not tell whether he had made the payments on which it ostensibly relied. Further BANA's avowed basis for holding Plaintiff liable was spurious, the mere fact that BANA sent statements and received payments does not make Plaintiff liable on the account.

101.    CBNA acted willfully in failing to investigate because it knew that it had sold the accounts to Midland, and on information and belief, failed to contact Midland regarding the accounts. Midland's records would have shown that Midland agreed that accounts were fraudulent.

102.    Plaintiff was damaged as aforesaid.

**Wherefore**, Plaintiff seeks the following relief:

A.  An amount to be determined by the jury for compensatory damages in an amount in excess of $75,000;

B.  An amount of punitive damages to be determined by the jury in excess of $75,000;

C.  An award of costs and reasonable attorneys' fees to Plaintiff;

D.  Such other and further relief the nature of the Plaintiff's cause may require.


## COUNT III – Violation of the Truth In Lending Act – BANA Only

103.    Plaintiff repeats the foregoing allegations as though fully set forth here.

104.    BANA is a card issuer within the meaning of 15 U.S.C. § 1602(o) because it is a person who issued a credit card.

105.    The account was a credit card account within the meaning of 15 U.S.C. § 1602(l) because it was a "card . . . or other credit device existing for the purposes of obtaining money, property, labor or services on credit."

106.    Plaintiff was a cardholder within the meaning of 15 U.S.C. § 1602(n) because Defendant issued a credit card to him, albeit without his knowledge or consent.

107.    Defendant approved charges that were "unauthorized" within the meaning of 15 U.S.C. § 1602(p) because Plaintiff never gave his actual, implied or apparent authority to use (or obtain) the card, and he received no benefit from the fraudulent use of the card.

108.    Defendant held Plaintiff liable for the unauthorized charges on the account, in violation of 15 U.S.C. § 1643(a), by its letter of June 30, 2020.

109.    Plaintiff suffered damages as aforesaid.

**WHEREFORE** Plaintiff asks for the following relief:

A.  Actual damages in excess of $75,000.00 in an amount to be determined by a jury;

B.  Statutory damages pursuant to 15 U.S.C § 1640(a)(2)(A)(i);

C.  An award of reasonable attorneys fees and costs pursuant to 15 U.S.C. § 1640(a)(3).


Respectfully submitted,

Dated: June 2, 2021                    MICHAEL S. CROPP

By: _/s/ Emanwel J. Turnbull_
Emanwel J. Turnbull
CPF# 1606210269
THE HOLLAND LAW FIRM, P.C.

914 Bay Ridge Rd, Ste 230
Annapolis, MD 21403
Telephone: (410) 280-6133
Facsimile: (410) 280-8650
eturnbull@hollandlawfirm.com

*Counsel for Plaintiff*

## **JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.


Dated: June 2, 2021

By:  */s/ Emanwel J. Turnbull*
Emanwel J. Turnbull
CPF# 1606210269
THE HOLLAND LAW FIRM, P.C.
914 Bay Ridge Rd, Ste 230
Annapolis, MD 21403
Telephone: (410) 280-6133
Facsimile: (410) 280-8650
eturnbull@hollandlawfirm.com

*Counsel for Plaintiff*